## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL SMITH,<br><br>      Plaintiff,<br><br>    v.<br><br>GILAT SATELLITE NETWORKS LTD.,<br>DOV BAHARAV, ELYEZER SHKEDY,<br>DAFNA COHEN, MEIR SHAMIR, DAFNA<br>SHARIR, AMIR OFEK, ISHAY DAVIDI,<br>AYLON RAFAELI, and AMIRAM BOEHM,<br><br>      Defendants. | Case No.:<br><br>JURY TRIAL DEMANDED<br><br>**COMPLAINT FOR VIOLATIONS OF**<br>**FEDERAL SECURITIES LAWS** |

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### BACKGROUND

1.      This action concerns a proposed transaction announced on January 29, 2020 pursuant to which Gilat Satellite Networks Ltd. ("Gilat" or "the Company") will be acquired by Comtech Telecommunications Corp. ("Comtech").

2.      On January 29, 2020, Gilat's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement"), pursuant to which Gilat shareholders will receive $7.18 in cash and 0.08425 shares of Comtech common stock for each share of Gilat common stock they own ("Merger Consideration"). Although the number of shares of Comtech common stock that Gilat shareholders will receive is fixed, the market value of the Merger Consideration will fluctuate with the market price of Comtech common stock and will not be known at the time Gilat shareholders vote to approve the

Merger Agreement.  Based on the closing price of Comtech common stock on the NASDAQ on January 28, 2020, the last trading day before the public announcement of the parties entering into the Merger Agreement, the Merger Consideration represented approximately $10.31 in value for each share of Gilat common stock.  By comparison, based on the closing price of Comtech common stock on the NASDAQ on March 2, 2020, the Merger Consideration represented approximately $9.56 in value for each share of Gilat common stock.

3.      On March 2, 2020, in order to convince Gilat's stockholders to vote in favor of the Proposed Transaction, Defendants filed a materially incomplete and misleading preliminary S-4 Registration Statement (the "Registration Statement") with the United States Securities and Exchange Commission ("SEC") and sent same to stockholders of Gilat.

4.      The Registration Statement omits material information with respect to the Proposed Transaction, which renders the Registration Statement false and misleading.  Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Registration Statement.

5.      In addition, a special meeting of Gilat's stockholders will be held to vote on the Proposed Transaction (the "Stockholder Vote").  It is therefore imperative that the material information that has been omitted from the Registration Statement is disclosed prior to the Stockholder Vote so Gilat stockholders can properly exercise their corporate voting rights and make an informed decision on whether to vote in favor of the merger.

## JURISDICTION & VENUE

6.      This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act and 28 U.S.C. §1331 because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

2

7.     This Court has jurisdiction over Defendants because each defendant is either a corporation that conducts business in this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because, among other things: (a) the conduct at issue will have an effect in this District; (b) a substantial portion of the transactions and wrongs complained of herein, occurred in this District; and (c) certain Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.  Additionally, the Company's common stock trades on the NASDAQ, which is headquartered in this District.

## THE PARTIES

9.     Plaintiff is, and has been continuously throughout all times relevant hereto, an owner of Gilat common stock.

10.     Defendant Gilat is a company organized under the laws of Israel and a party to the Merger Agreement.  Gilat common stock is traded on the NASDAQ under the ticker symbol "GILT."

11.     Defendant Dov Baharav is Chairman of the Board of the Company.

12.     Defendant Elyezer Shkedy is a director of the Company.

13.     Defendant Dafna Cohen is a director of the Company.

14.     Defendant Meir Shamir is a director of the Company.

15.     Defendant Dafna Sharir is a director of the Company.

16.     Defendant Amir Ofek is a director of the Company.

17.     Defendant Ishay Davidi is a director of the Company.

18.     Defendant Aylon Rafaeli is a director of the Company.

19.     Defendant Amiram Boehm is a director of the Company.

## FACTS

20.     Gilat is a leading global provider of satellite-based broadband communications. With 30 years of experience, Gilat designs and manufactures cutting-edge ground segment equipment, and provides comprehensive solutions and end-to-end services, powered by Gilat's innovative technology. Delivering high-value competitive solutions, Gilat's portfolio includes a cloud-based VSAT network platform, high-speed modems, high-performance on-the-move antennas and high efficiency, high power Solid State Amplifiers (SSPA) and Block Upconverters (BUC). Gilat's comprehensive solutions support multiple applications with a full portfolio of products to address key applications including broadband access, cellular backhaul, enterprise, in-flight connectivity, maritime, trains, defense and public safety, all while meeting the most stringent service level requirements.

21.     Comtech is a leading provider of advanced communications solutions for both commercial and government customers worldwide. Comtech's solutions fulfill its customers' needs for secure wireless communications in some of the most demanding environments, including those where traditional communications are unavailable or cost-prohibitive, and in mission-critical scenarios where performance is crucial. In recent years, Comtech has benefited from an increase in market demand for global voice, video and data usage which has resulted in Comtech growing.

22.     On January 29, 2020, Gilat's Board caused the Company to enter into the Merger Agreement.

23.     The Merger Agreement provides that Gilat has agreed with Comtech, a Delaware

corporation, and Convoy Ltd., a company organized under the laws of Israel and wholly-owned subsidiary of Comtech ("Merger Sub").  Under the Merger Agreement, among other things and subject to terms and conditions set forth therein, Merger Sub will be merged with and into the Company, with the Company surviving as a wholly-owned subsidiary of Comtech (the "Merger").

24.     At the Effective Time (as defined in the Merger Agreement), and as a result of the Merger:

> Each Company Share issued and outstanding immediately prior to the Effective Time (other than shares to be cancelled in accordance with Section 2.7(a)(ii)), shall automatically be converted into and represent the right to receive the Merger Consideration, without interest and less applicable Taxes required to be withheld, in each case in the manner provided in Section 2.8 and Section 2.13 (or in the case of a lost, stolen or destroyed certificate, upon delivery of an affidavit in the manner provided in Section 2.10). No certificate or scrip representing fractional shares of Parent Common Stock shall be issued upon the surrender for exchange of Certificates or with respect to book-entry shares, and such fractional share interests shall not entitle the owner thereof to vote or to any other rights of a shareholder of Parent. Notwithstanding any other provision of this Agreement, each holder of Company Shares converted pursuant to the Merger who would otherwise have been entitled to receive a fraction of a share of Parent Common Stock shall receive, in lieu thereof, cash, without interest, in an amount equal to (A) such fractional part of a share of Parent Common Stock multiplied by (B) the Parent Average Trading Price.

25.     The Merger Consideration is unfair because, among other things, the intrinsic value of the Company is in excess of the amount the Company's stockholders will receive in connection with the Proposed Transaction.

26.     It is therefore imperative that the Company common stockholders receive the material information that Defendants have omitted from the Registration Statement so that they can meaningfully assess whether the Proposed Transaction is in their best interests prior to the vote.

27.     Section 6.1 of the Merger Agreement provides for a "no solicitation" clause that prevents Gilat from soliciting alternative proposals and constraints its ability to negotiate with potential buyers:

a)         From the date of this Agreement until the earlier to occur of the termination of this Agreement pursuant to Article VIII and the Effective Time, except as expressly permitted by Sections 6.1 and 6.2, the Company shall, and shall cause its Subsidiaries and its and their respective officers and directors to, and shall instruct and use its reasonable best efforts to cause its and their respective other Representatives to, immediately cease and cause to be terminated, and shall not authorize or knowingly permit any of its Representatives to continue, any and all existing discussions or negotiations with any Third Party conducted prior to the date hereof by the Company, any of its Subsidiaries or any of their respective Representatives that constitute or could reasonably be expected to lead to any Acquisition Proposal, and shall promptly terminate access by each such Third Party and such Third Party's Representatives to any data room (whether online or otherwise) containing information in respect of the Company or its Subsidiaries. The Company shall, within two (2) Business Days following the date of this Agreement, request in writing that each Third Party that has previously executed a confidentiality agreement in connection with its consideration of making an Acquisition Proposal in the one year period prior to the date of this Agreement promptly return or destroy all confidential information previously furnished to such Third Party by or on behalf of the Company, any of its Subsidiaries or any of their respective Representatives.

(b)         At all times during the period commencing with the execution and delivery of this Agreement and continuing until the earlier to occur of the termination of this Agreement pursuant to Article VIII and the Effective Time, except as expressly permitted by Sections 6.1 and 6.2, the Company shall not, nor shall its Subsidiaries, any of their respective officers and directors or any other Company Shareholders that have executed the Voting Agreement, and the Company shall instruct and shall use reasonable best efforts to cause its and its Subsidiaries' other Representatives not to, directly or indirectly, (i) whether publicly or otherwise, solicit, initiate, knowingly encourage or knowingly facilitate or induce the making, submission or announcement of an Acquisition Proposal or any inquiry, offer, proposal or indication of interest that constitutes or could reasonably be expected to lead to any Acquisition Proposal; (ii) in connection with or in response to any Acquisition Proposal or any inquiry, offer, proposal or indication of interest that could reasonably be expected to lead to an Acquisition Proposal, furnish to any Third Party any non-public information relating to the Company or any of its Subsidiaries, or afford access to the business, properties, assets, books or records or other information of the Company or any of its Subsidiaries to any Third Party; (iii) enter into, conduct, participate or engage in negotiations or discussions with any Third Party (other than solely to inform such Third Party that the terms of this Agreement prohibits such discussions) relating to or for the purpose of encouraging or facilitating an Acquisition Proposal; (iv) approve, adopt, declare advisable, endorse or recommend an Acquisition Proposal; (v) execute or enter into any letter of intent, memorandum of understanding, agreement in principle, term sheet, merger agreement or Contract contemplating or otherwise relating to an Acquisition Transaction (an "**Alternative Acquisition Agreement**") or requiring the Company to abandon, terminate or fail to consummate the transactions contemplated by this

Agreement; (vi) fail to enforce, terminate, amend, modify, waive or release any rights under any "standstill" or other similar agreement (unless the Company Board determines in good faith (after consultation with its outside legal counsel) that the failure to grant any waiver or release under any standstill or similar agreement would be inconsistent with its fiduciary duties under Israeli Law); or (vii) resolve, propose or agree to do any of the foregoing. Notwithstanding the foregoing, prior to obtaining the Requisite Shareholder Approval, if at any time the Company receives an unsolicited *bona fide* written Acquisition Proposal after the date of this Agreement that did not result from a breach (other than immaterial and unintentional breaches) of this Section 6.1 (but only if, in the case of clauses (B) and (C), the Company Board determines in good faith (after consultation with the Company's financial advisors and outside legal counsel) that such Acquisition Proposal constitutes or is reasonably likely to lead to a Superior Proposal and that (after consultation with outside legal counsel) the failure to take such actions would be inconsistent with the fiduciary duties of the Company Board under Applicable Law), then the Company in response to such Acquisition Proposal may (A) contact the Third Party or any of its Representatives who has made such Acquisition Proposal solely for the purpose of seeking clarification of solely those terms or conditions of such Acquisition Proposal necessary to make a determination that such Acquisition Proposal constitutes or is reasonably likely to lead to a Superior Proposal, (B) engage or participate in discussions or negotiations with such Third Party or any of its Representatives regarding such Acquisition Proposal and (C) afford access and furnish to such Third Party or to any of its Representatives any information relating to the Company, to any of its Subsidiaries or to their respective businesses, properties or assets or provide access to data room (virtual or physical) pursuant to a confidentiality agreement (which the Company and its Representatives will be permitted to negotiate) the terms of which, taken as a whole, are no less favorable to the Company than those contained in the Confidentiality Agreement and do not include any provision calling for the exclusive right to negotiate with such party or having the effect of prohibiting the Company from satisfying its obligations hereunder (an "**Acceptable Confidentiality Agreement**"); provided, that any such information (to the extent that such information has not been previously provided or made available to Parent) is furnished or made available to Parent prior to or substantially concurrently (and in any event within 24 hours) with the provision or making available of such information to such Third Party. Within 24 hours after receipt by the Company of an Acquisition Proposal, the Company shall give Parent notice both orally and in writing and shall identify (x) the material terms and conditions of such Acquisition Proposal, including any financing arrangements to the extent provided to the Company or its Representatives (other than the identity of the Third Party who has made the Acquisition Proposal), (y) whether such Third Party is a financial or strategic buyer, and (z) a copy of any written materials provided by such Third Party in connection with such Acquisition Proposal (redacted so as not to identify the Third Party who has made the Acquisition Proposal).

(c)        Without limiting the generality of the foregoing, Parent, Merger Sub and the Company acknowledge and agree that any violation of the restrictions set

forth in this <u>Section 6.1</u> by any Subsidiary of the Company, any directors or officers of the Company or its Subsidiaries, or any other Company Shareholders who have executed the Voting Agreement, shall be deemed to be a breach of this <u>Section 6.1</u> by the Company. The Company shall use its reasonable best efforts to cause its and its Subsidiaries' other Representatives to comply with the restrictions set forth in this <u>Section 6.1</u>.

(d)       In addition to the obligations of the Company set forth in <u>Section 6.1(b)</u>, the Company shall promptly, and in all cases within 24 hours of its receipt, advise Parent orally and in writing of any (i) Acquisition Proposal; (ii) request for information or request to engage in negotiations or discussions or any other inquiry with respect to, or that could reasonably be expected to lead to, an Acquisition Proposal; or (iii) request for a waiver or release under any standstill or similar Contract. The Company shall provide Parent with (A) the material terms and conditions of such Acquisition Proposal, request or inquiry, including any financing arrangements to the extent provided to the Company, any of its Subsidiaries or any Representative of the Company (other than the identity of the Third Party who has made the Acquisition Proposal, request or inquiry), (B) whether such Person or group making any such Acquisition Proposal, request or inquiry, is a financial or strategic buyer, and (C) copies of all written materials provided by such Person in connection with such Acquisition Proposal, request or inquiry (redacted so as not to identify the Person who has made such Acquisition Proposal, request or inquiry).

(e)        The Company shall keep Parent reasonably informed of the status of discussions relating to, and the material terms and conditions (including all amendments or proposed amendments to such material terms and conditions) of any such Acquisition Proposal, request or inquiry, and promptly (and in no event later than 24 hours thereafter), shall provide Parent with copies of any revised written proposals or draft agreements relating to any Acquisition Proposal, request or inquiry.

28.       In addition, Section 8.3 of the Merger Agreement requires Gilat to pay a $21,675,000.00 "termination fee" to Comtech in the event this agreement is terminated by Gilat and improperly constrains the Company from obtaining a superior offer.

29.       Defendants filed the Registration Statement with the SEC in connection with the Proposed Transaction.

30.       As alleged herein, the Registration Statement omits material information with respect to the Proposed Transaction, which renders the Registration Statement false and misleading.

31.     First, the Registration Statement omits material information regarding Gilat's and Comtech's financial projections.

32.     With respect to Gilat's financial projections, the Registration Statement fails to disclose (i) all line items used to calculate (a) adjusted EBITDA and (b) unlevered free cash flow; and (ii) a reconciliation of all non GAAP to GAAP metrics.

33.     With respect to Comtech, the Registration Statement omits entirely Comtech's financial projections.

34.     The disclosure of projected financial information is material information necessary for stockholders to gain an understanding of the basis for any projections as to the future financial performance of the combined company.  In addition, this information is material and necessary for stockholders to understand the financial analyses performed by the companies' financial advisor rendered in support of any fairness opinion.

35.     Second, the Registration Statement omits material information regarding the analyses performed by the Company's financial advisors Jefferies LLC ("Jefferies") in connection with the Proposed Transaction.

36.     With respect to Jefferies's *Selected Public Companies Analysis for the Company*, the Registration Statement fails to disclose the individual multiples and metrics for the companies observed by Jefferies in the analyses.  This information must be disclosed to make the Registration Statement not materially misleading to Gilat stockholders and provide stockholders with full and relevant information in considering how to vote.

37.     With respect to Jefferies's *Selected Precedent Transactions Analysis for the Company*, the Registration Statement fails to disclose the individual multiples and metrics for the transactions observed by Jefferies in the analyses.  This information must be disclosed to make the

Registration Statement not materially misleading to Gilat stockholders and provide stockholders with full and relevant information in considering how to vote.

38.     With respect to Jefferies's *Discounted Cash Flow Analysis for the Company*, the Registration Statement fails to disclose (i) the Company's forecasted after-tax free cash flows, (ii) the Company's terminal value, (iii) Jefferies's basis for applying a growth rate 1.5% to 2.5%, and (iv) the individual inputs and assumptions underlying the range of discount rates of 8.0% to 9.0%. This information must be disclosed to make the Registration Statement not materially misleading to Gilat stockholders and provide stockholders with full and relevant information in considering how to vote.

39.     With respect to Jefferies's *Selected Public Companies Analysis for the Comtech*, the Registration Statement fails to disclose the individual multiples and metrics for the companies observed by Jefferies in the analyses. This information must be disclosed to make the Registration Statement not materially misleading to Gilat stockholders and provide stockholders with full and relevant information in considering how to vote.

40.     The omission of the above-referenced material information renders the Registration Statement false and misleading.

41.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's stockholders.

**CLAIMS FOR RELIEF**

**COUNT I**

**(AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT AND RULE 14a-9 PROMULGATED THEREUNDER)**

42.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

43.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, requires that proxy communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

44.     Defendants issued the Registration Statement with the intention of soliciting stockholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Registration Statement and the use of their name in the Registration Statement, which fails to provide critical information regarding, among other things, the financial projections that were prepared by the Company and relied upon by the Board in recommending the Company's stockholders vote in favor of the Proposed Transaction.

45.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  By virtue of their roles as officers and/or directors, each of the Individual Defendants were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Registration Statement, but nonetheless failed to obtain and disclose such information to stockholders as required.

46.     The preparation of a Registration Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. Defendants were negligent in preparing and reviewing the Registration Statement.  Defendants were also negligent in choosing to omit material information from the Registration Statement or failing to notice the material omissions in the Registration Statement upon reviewing it, which they were required to do carefully.

47.     The misrepresentations and omissions in the Registration Statement are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff has no adequate remedy at law.

**COUNT II**

**(AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT)**

48.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

49.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

50.     Each of the Individual Defendants was provided with or had unlimited access to

copies of the Registration Statement and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

51.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Registration Statement at issue contains the unanimous recommendation of the Board to approve the Proposed Transaction. The Individual Defendants were thus directly involved in the making of the Registration Statement.

52.     In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

53.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

54.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, plaintiff will be irreparably harmed.

55.     Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.    Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.    In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.    Directing the Individual Defendants to disseminate a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.    Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.    Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable.

Dated: March 4, 2020

**MOORE KUEHN, PLLC**

*/s/Justin Kuehn*
Justin A. Kuehn
Fletcher W. Moore
30 Wall Street, 8th floor
New York, New York 10005
Tel: (212) 709-8245
jkuehn@moorekuehn.com
fmoore@moorekuehn.com

*Attorneys for Plaintiff*